# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 17, 2004 Session

## STATE OF TENNESSEE v. HOWARD WALTER THOMAS

**Appeal from the Criminal Court for Knox County**
**No. 71670     Richard R. Baumgartner, Judge**

---

**No. E2003-02090-CCA-R3-CD - Filed March 30, 2005**

---

The defendant, Howard Walter Thomas, was convicted of first degree premeditated murder; especially aggravated robbery, a Class A felony; especially aggravated kidnapping, a Class A felony; and attempted first degree murder, also a Class A felony. He was sentenced to life imprisonment for the first degree murder conviction and sentenced as a Range I, standard offender to twenty-two years for the especially aggravated robbery conviction, twenty-two years for the especially aggravated kidnapping conviction, and twenty-five years for the attempted first degree murder conviction, with the twenty-two-year sentences to be served concurrently and the twenty-five-year sentence to be served consecutively, for an effective sentence of life plus twenty-five years. On appeal, the defendant raises the following claims: (1) the circumstances surrounding his identification by one of the victims amounted to prejudicial error; (2) the trial court erred by allowing the State to exercise a peremptory challenge based on the juror's learning disability, by utilizing the pattern jury instructions on the element of deliberation, by proceeding with a death-qualified jury after the State withdrew its intent to seek the death penalty post-trial, and by failing to provide any weight to the mitigating factor of childhood/family background in sentencing for the attempted first degree murder conviction; (3) the evidence was insufficient to support a verdict of guilt with respect to the element of deliberation; (4) the death penalty is unconstitutional under the Tennessee and United States Constitutions; and (5) that cumulative error denied the defendant a fair trial. Following our review, we affirm the convictions but, in light of the subsequent decision of the United States Supreme Court in Blakely v. Washington, 542 U.S. __, 123 S. Ct. 2531 (2004), reduce the sentences for attempted first degree murder, especially aggravated robbery, and especially aggravated kidnapping to twenty-one years, eighteen years, and eighteen years, respectively. We affirm the consecutive sentencing of the defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. DAVID G. HAYES, J., filed a dissenting opinion.

W. Thomas Dillard and Stephen Ross Johnson, Knoxville, Tennessee (at trial and on appeal); Jeanne L. Wiggins and Russell T. Greene, Knoxville, Tennessee (at trial), for the appellant, Howard Walter Thomas.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and William H. Crabtree and Sally Jo Helm, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**<u>FACTS</u>**

Because of the complexity of this matter, we first will give an overview of the facts. While passing through Knoxville on the morning of March 23, 1991, on their way to vacation in North Carolina, John and Yvonne Cook of Wausau, Wisconsin, exited Interstate 275 to check their map for directions. While they were stopped on the entrance ramp, an assailant shot into their van, driven by Mr. Cook, who was struck twice. The shooter, later identified as the defendant, then got into the van with them and drove to a rural area of Knox County. After demanding money from Mrs. Cook, the defendant dumped Mr. Cook's body on the side of the road and ordered Mrs. Cook out of the van. He forced her onto the ground and attempted to shoot her but had trouble reloading his weapon. A passing motorist startled the defendant, who fled the scene in the victims' van. By that time, Mr. Cook had died. The defendant was arrested nine years later; and the trial, which is the basis for this appeal, followed.

Testifying as the State's first witness at trial, Mrs. Cook said that she was asleep in a make-shift bedroll behind the front captain's chairs in the van on the morning of March 23, 1991, and awoke when her husband pulled off the interstate in Knoxville and onto a ramp. It was raining heavily. As he turned the map light on and reached to get the atlas from the dashboard, he said, "Oh, my God." She then heard an explosion, followed by another "pop," as he slumped over in the seat toward her. She knew that he was injured "because there was a lot of blood . . . coming from mostly behind his left ear." At this time, Mrs. Cook was "sitting pretty much between the two front captain seats" on the floor. The defendant began smashing out the driver's side window, trying to get into the van, saying, "[H]ow the fuck do you get this power lock – this lock open?" He then opened the door and began pushing Mr. Cook out of the driver's seat. Mrs. Cook unlatched her husband's seatbelt, and the defendant pushed him into her arms. She got a "[f]ull facial view" of the defendant as he got into the driver's seat because the map light was on and all of the dome lights in the van came on when he opened the door. She also noticed he was carrying a gun, which he laid across his lap with the barrel pointing at her head. Mrs. Cook testified that, at this point, the defendant was sitting "[j]ust inches" from her, and she could have touched him if she had wanted to.

The defendant then drove back onto the interstate, headed north, the direction from which the Cooks had just traveled. She applied pressure to her husband's neck "in hopes that [she] could do something to save his life," and begged the defendant to release them so she could get medical

help for her husband. The defendant refused, saying, "Shut up, you fucking bitch. He's already dead." They continued on the interstate for approximately fifteen to twenty minutes at a "[v]ery high rate of speed." Mrs. Cook said that after "maybe 10 minutes," her husband's heart stopped beating. When she again begged the defendant for medical help for Mr. Cook, the defendant said, "Shut the fuck up and don't look at me. I'm going to kill you, too." The defendant then exited the interstate and drove to a rural, two-lane road where he "would kind of speed up and then he would go real slow, and I thought, 'Well, he's looking for a place to stop and kill me and dump us out.'" By that time, Mrs. Cook had realized that her husband was dead. The defendant pulled over to the right side of the road and demanded money from her, stating, "[I]t better be more than a hundred dollars." She reached into her purse, pulled out her husband's wallet, and gave the defendant the cash from the wallet. The cash was in "many denominations of tens and twenties" and totaled somewhere between "five hundred, eight hundred, perhaps even a thousand dollars." Mrs. Cook said that, as she handed the money to the defendant, she was "covered with blood" and her husband's blood was all over her hands.

The defendant then told Mrs. Cook, "Get the fuck out of here and get him out of here." She opened the passenger side sliding door and attempted to pull her husband's body out of the van but was unable to do so. The defendant then exited the van, came around behind it, and "dumped" Mr. Cook's body out onto the ground. Asked how close she was to the defendant, Mrs. Cook replied, "Oh, I stood up right next to him." She said that the defendant was shorter than she. He ordered Mrs. Cook not to look at him and to get down on her hands and knees beside her husband. He then pointed the gun at Mrs. Cook's head as he attempted to load it, but he had trouble doing so because he was wearing "black leather-type gloves." Several of the bullets fell on the ground beside Mrs. Cook. Still on the ground, Mrs. Cook continued to beg for her life, saying, "John is already dead. I have two children that need me more now than ever." The defendant responded, "Shut the fuck up. I'm not going to rot in some fucking prison because you can identify me." Mrs. Cook said a white car then came down the road, shining its lights onto her, which caused the defendant to flee in the van.

Law enforcement officers arrived soon thereafter, and Mrs. Cook tried to recount what had happened and the route they had traveled. She also rode with officers in an effort to retrace their route. They subsequently returned to the scene, where she met Detective Charlie Bundren of the Knoxville Police Department ("KPD"). Mrs. Cook then went to the police station and gave a detailed description of the assailant, including that he was very young, had no facial hair, and had been wearing a dark-colored jacket and a camouflage scarf around his head "that was clear down onto his eyebrows and tied behind his head." Later in the day, the van was located.

Mrs. Cook testified that, shortly after returning home, she began seeing a psychiatrist, Dr. Sheila Stanton. At her suggestion, Mrs. Cook agreed to undergo hypnosis and began meeting with Dale Sternberg, a clinical social worker, who explained to her that the sessions would be a "form of

relaxation and concentration."[1]  Mrs. Cook said that the reason she wanted to do this was to "help do something to solve the case."  Asked about the hypnosis, she explained that she was in a state of "deep concentration and relaxation," always aware of her surroundings, and during these sessions, her image of the assailant never changed.

Subsequently, she met with a police sketch artist from the Wausau Police Department who prepared a composite of the assailant, which Mrs. Cook rated a "seven" on a scale of one to ten.  She "believed it was the best that we could do" but that it did not "look exactly like the person."  During the year following the incident, Mrs. Cook viewed photographic and video lineups from the KPD in a cooperative effort with the Wausau Police Department.  Although she saw similarities in the lineups, she never identified anyone as the assailant.

In May 2000, Detective Bundren phoned Mrs. Cook and told her that the KPD had arrested a suspect.  Shortly thereafter, a friend in Knoxville sent her a newspaper article from the Knoxville News-Sentinel about the arrest, the article including small photographs both of her husband and the defendant as he appeared in 2000 ("newspaper photograph"). Mrs. Cook identified the defendant in court as the person who committed the crimes against her and her husband, as well as a photograph of the clean-shaven defendant as he appeared in 1990 ("1990 photograph").[2]

On cross-examination, Mrs. Cook acknowledged that during the ordeal, she had seen the defendant mostly by his profile and that she had "always felt that that would be the best way that [she] could identify the individual."  She did not recall ever receiving any profile shots from the police department, only head shots.  She acknowledged that one subject in the video lineup shown to her in July 1992 had similarities to the assailant, and his profile and body language were as she had remembered the assailant's.  Although she requested a tape of the subject's voice, she never received one.

Leroy Jarvis, the resident at 9109/9111 Norris Freeway where Mr. Cook's body was dumped, testified that he went outside to get the newspaper around 6:00 a.m. on March 23, 1991, and, while returning to his house, saw a "late model GM van" pulling out of his driveway.  He went inside, but because his dog continued barking, Jarvis went back outside and saw Mrs. Cook kneeling at the end of his driveway.  She said, "I think my husband's dead," and he saw Mr. Cook's body lying facedown at the end of his driveway. Jarvis called 9-1-1 and stayed with Mrs. Cook until emergency personnel arrived.

Jack Thomas, a retired Knox County Sheriff's Department crime scene technician, testified that he recovered bullets from the ground beside Mr. Cook's body, which he identified in court as .22 caliber bullets, and "automotive-type glass" from the side of the road.

---

[1]Because these sessions were the basis for one of the assignments on appeal, as well as the subject of a pretrial hearing, we will discuss them more thoroughly when we review the suppression issues raised by the defendant.

[2]This photograph is also the basis for an assignment which we will more thoroughly review in our analysis.

Knoxville Police Officer Dick Evans testified that he was patrolling his "beat boundaries" sometime after 6:30 a.m. on March 23, 1991, when he saw the victims' van backed into a business in the area of Dutch Valley, "where it comes into Central Avenue and Coster," but continued on his patrol. Shortly thereafter, he received a "be on the lookout" ("BOLO") over the radio for a stolen vehicle and immediately remembered the van he had seen earlier. Officer Evans returned to the scene, looked inside the van, noticed the driver's side window had been broken out and a large amount of blood in the van, and secured the scene until the KPD crime scene unit arrived.

James Humphrey, a federal court security officer for the United States Marshals Service who was a Knoxville police officer in 1991, said that he was the "lead specialist for the crime lab, crime scene processing." Humphrey said he processed the victims' van, which was "in total disarray like it had been ransacked." The front seats were "bloody, quite a bit of blood" and they were unable to get any identifiable fingerprints from the vehicle, only "smudges." The van was located at Bruhin Road and Central Avenue Pike, near Interstate 640. According to Humphrey, while a fence in the area would prevent a person from crossing the interstate on foot, a bridge across the interstate, which was identified on redirect as a train track, would allow travel south across Interstate 640 and back into Knoxville.

Retired KPD Detective Charlie Bundren testified that he was on duty as a homicide investigator on March 23, 1991, and was contacted around 8:00 a.m. to go to the location on Norris Freeway. Shortly after arriving, he drove Mrs. Cook to the location where the van had been discovered, and she identified it as hers. Bundren noticed that the driver's side window had been broken out and that the door on the driver's side was open. He then took her to the hospital to "see if [she] could see a doctor or something about the state of mind she was in and to – for Mr. Cook." After they left the hospital, they went to Interstate 275 where Mrs. Cook retraced the route she and her husband had been traveling. He determined the location of the crimes to be the Merchants Road exit, as had the Knox County Sheriff's Department. Mrs. Cook then returned to the police station with Detective Bundren and gave a tape-recorded statement and description of the suspect. After the suspect's description was broadcast, the police department "started getting calls from citizens about they thought they were being shot at on the interstate. We did have two or three instances where vehicles – some kind of object hit their vehicle." He also sent photographic and video lineups to the law enforcement agency in Wisconsin where Mrs. Cook lived, but eventually the investigation "just kind of dried up."

To follow up on a lead, Detective Bundren and two other detectives went to Atlanta, Georgia, in May 2000 where they talked to Mary Storm and got the names of two suspects, Ernest Salyer and the defendant, Howard Walter Thomas. After returning to Knoxville, Detective Bundren located Ernest Salyer, who was brought in on May 17, 2000, to give a statement, as were Salyer's mother, Joyce Salyer; his sister, Sammie Salyer; and his wife at the time, Loretta Strange. Later that evening, he charged the defendant with felony murder and called Mrs. Cook to advise her that an arrest had been made. He said that after May 17, 2000, he believed the correct location of the crimes was the Woodland Avenue exit.

On cross-examination, Detective Bundren said that in 1991 there was a Howard Johnson Hotel at the Merchants Road exit but not at the Woodland Avenue exit. He said that none of the lineups sent to Mrs. Cook contained a photograph of the defendant because he was not a suspect at the time. He did not have any suspect profile shots to send to the Wausau Police Department even though Mrs. Cook had emphasized that her best view of the assailant was from the side. However, one of the video lineups did depict profiles of the suspects.

FBI Special Agent Michael Freeman testified that in March 1991, he was a homicide detective with the Knox County Sheriff's Department and was the first detective on the scene on Norris Freeway. After Mrs. Cook calmed down somewhat, he went with her and another detective to retrace the route the defendant had driven when they were in the van. They went back to Interstate 275 and began traveling southbound toward the Knoxville city limits, and "[w]hat struck [them] was there was an obvious difference . . . once you passed . . . from the county roads into the city area, it became illuminated." He said that, as they approached Merchants Road, "[t]he lights opened up and she seemed – you know, recollection began to . . . come forth, and she said, 'This may be it.'" They exited the interstate at Merchants Road and by then it was daylight and no longer raining. Agent Freeman testified that he and his partner knew "that our jurisdiction was gone" and that they would be turning the case over to the KPD. They never went further south on the interstate to the Woodland Avenue exit but instead returned northbound to the location of Mr. Cook's body on Norris Freeway.

Ernest Salyer[3] testified that he and the defendant were "[b]est friends, like brothers," and he had known the defendant since he was fourteen or fifteen years old. On March 23, 1991, Ernest lived with his mother, Joyce Salyer, in Knoxville and early that morning, he received a telephone call from the defendant who asked him to come pick him up at a car wash on Heiskell Avenue. When Ernest arrived at the car wash, the defendant, dressed in blue jeans, a jacket, and a bandana around his head, "c[a]me out from around the corner of the car wash." As the defendant got into the car, Ernest noticed that he had blood on his jacket and jeans and was carrying a rifle wrapped in a blanket or a sheet. The defendant told Ernest that he had "killed somebody." According to Ernest, the defendant lived on West Oak Hill Avenue, off Woodland Avenue, at the time. He said the defendant's house was "[p]robably a couple of blocks" from the Woodland interchange at the interstate and about a mile from the car wash. They went to the defendant's house, where the defendant told Ernest "he run across the interstate and shot in a vehicle, jumped in it and drove them to Norris Freeway." The defendant told Ernest that, on Norris Freeway, he "got the woman out and he was going to shoot her and started reloading his gun and it got jammed and a car come and scared him and he took off." They then went to Ernest's house, where he told his mother that the defendant had been in a fight and asked her to wash the defendant's clothes, which she did. Asked about the defendant's facial hair, Ernest said, "I don't believe he had much, if he had any at all." Ernest and the defendant then went to the home of Ernest's grandmother, Goldie Storm, in order to hide the gun,

---

[3]Because Ernest Salyer and Joyce Salyer both testified at the trial, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

which Ernest identified as a ".22 semi-automatic." Afterwards, they returned to Ernest's house where the defendant gave Ernest's sister, Sammie, a twenty-dollar bill, which had some blood on it, and told her to buy something for her son. Later that evening, Ernest told his mother, "[The defendant] killed somebody, and I took the gun to my grandmother's and hid it." Two or three days later, Ernest and the defendant retrieved the gun from his grandmother's house, and the defendant took it with him. At that time, Ernest noticed that the defendant had dyed his hair black.

Ernest was then shown the 1990 photograph and a 1991 photograph and identified both as photographs of the defendant, saying that the 1990 photograph looked more like the defendant as he had appeared on March 23, 1991. Ernest said that in the nine years since the crimes, the defendant mentioned the crimes "[m]ostly when he was drinking." Ernest explained that the reason he did not inform the police about what the defendant had done was because he was scared and loved the defendant "like a brother, didn't want to see him in trouble." On cross-examination, Ernest acknowledged that, on the day of the crimes, the defendant could have looked more like the 1991 photograph than the 1990 photograph.

Joyce Salyer testified that the defendant called her house early in the morning on March 23, 1991, asking for Ernest, who left and returned later with the defendant. The defendant's clothes had blood on them, and he said he had been in a fight. She washed his clothes and gave him some others to wear. Ernest and the defendant left the house and, when they returned, Sammie Salyer was there. The defendant gave Sammie a twenty-dollar bill, and Joyce noticed the money "had red on it . . . [l]ooked like blood." Later, Joyce became concerned that Ernest and the defendant were not telling her the truth and, after watching the news report concerning the murder, talked to Ernest who "told [her] about it." When she found out about the gun, she asked Ernest to get it from her mother's house because her mother "didn't need to be involved in this." Joyce said she put the defendant's clothes in a plastic bag and gave them to her mother to burn. She identified the 1990 and 1991 photographs of the defendant and said the defendant looked more like the 1990 photograph on the day of the murder.

Goldie Storm testified that on March 23, 1991, around 11:00 a.m., Ernest and the defendant came to her house with a .22 rifle. Ernest asked if she could keep the gun for a few days, and she agreed. He put the gun in the living room closet, where it remained until he and the defendant returned two days later and removed it from the house. She told Joyce to bring the defendant's clothes to her house where she burned them with the garbage.

Sandy Buckner, a friend of the defendant, testified that she was working at Vol Market, a twenty-four-hour convenience store on the corner of Woodland and Central, on March 23, 1991. The defendant came into the store during the very early morning hours, and around 5:00 a.m. she gave him a ride home. He was wearing boots, blue jeans, and a leather jacket and had a bandana in his pocket or on his head. When she saw the defendant in the store a few days later, his hair was darker and he was dressed differently than normal, now wearing tennis shoes. She said the defendant seemed "worried," because the description of the suspect in the newspaper "could have been him." He told her he changed his hair color because he was "afraid that he would match . . . look like the

guy in the newspaper." She said the defendant "asked me that was he with me that night, . . . the previous night before, and I said yeah."

Loretta Strange, Ernest Salyer's ex-wife, testified she was sixteen years old on March 23, 1991, and remembered hearing on the news about a man being shot by a sniper. Approximately two weeks later, she and the defendant, who were dating,[4] were watching the television show "Hunter" when the defendant said, "I'm glad there's not cops like that here in Knoxville, because if so, I'd already be arrested." She asked him what he was talking about, and he replied, "The guy on the interstate, I did that, and if there were cops like that here, I'd already be arrested." Sometime later in 1991, while she and the defendant were walking down a path through the woods near the defendant's house, he said, "This is where I killed that guy. . . . [T]his is where I did it. I sat up here. I shot at cars, and I hit somebody." Strange said the path was "right next to the [Woodland Avenue] exit," which was "[a] couple of blocks maybe" from the defendant's house. Four or five years later, after the defendant had been fighting with his wife and Strange had problems with one of her ex-husbands, the defendant told her "he had killed someone once before, and he could do it again if he had to, and he was in reference to the I-75 thing."

Strange also said that, shortly after the murder, the defendant's "black denim jacket" with "beads and leather patches on it" just "disappeared one day." Because he had promised it to her, she asked him where it was, and he replied, "It's gone. It's gone." On cross-examination, Strange said that, after the murder, the defendant dyed his hair black, "so black that it looked blue in the light," and that before March he had "cut his hair and became kind of clean cut looking for a little while." She also testified that, at one point, he told her he "accidentally" shot someone on the interstate and "that if [she] told anyone he would kill [her]."

On redirect, Strange said that, after the defendant told her about the shooting, he explained the details:

> He got in the van. He made the woman hold her husband as he drove her around. I don't know exactly where he drove her to. He'd had a conversation with her saying he was going to have to kill her because he wasn't going to prison and that she was the only witness. He was actually going to kill her. He had her outside of a van fixing to shoot her. A car came along; scared him. He got in the van and left.

Sammie Salyer testified that there was a red spot on the twenty-dollar bill the defendant gave her on March 23, 1991, but she had "no idea what it was." She did not see the defendant with a wad of cash that morning.

Counsel stipulated to the testimony of Dr. Francis Jones, a retired pathologist who performed the autopsy on Mr. Cook, that the cause of death was "two small caliber – .22 caliber gunshot

---

[4]Apparently, Loretta Strange dated Ernest Salyer and the defendant when she was a teenager and later married and divorced Ernest. She testified, "We were always kind of a threesome, me, Ernest, and [the defendant]."

wounds to the head." It was further stipulated "that the wounds were survivable with immediate treatment . . . . [T]here would be an immediate loss of consciousness. The victim could have lived for up to possibly 10 minutes. There would be hemorrhaging from the wounds. The heart would beat rapidly, and eventually stop."

Lieutenant Glen Edward Biggs of the KPD testified that on March 25, 1991, he was at the Woodland Avenue exit investigating a different case, when he found a "quantity of safety glass" on the entrance ramp to the interstate. He informed Detective Bundren of the glass but did not collect it. Biggs also assisted with the investigation of Mr. Cook's death and testified regarding a videotape he made on April 17, 2003, from a police cruiser retracing the route from Woodland Avenue to 9111 Norris Freeway, which was 14.2 miles and took about eighteen minutes to drive. He said that the distance between the defendant's house and the Woodland Avenue exit was approximately two city blocks, and a railroad track was a route between the car wash on Heiskell Avenue and the location where the victims' van was found. Another detective "ran all the way down the railroad tracks" from Heiskell Avenue to the car wash, which took about eleven minutes. He estimated the distance between the location of the van and the car wash at approximately one mile.

Following this testimony, the State rested its case in chief, and the defendant elected not to testify or put on any proof.

After the verdicts were announced by the jury, Mrs. Cook testified, "I feel death for [the defendant] would be a too-easy way out. It is my wish that you sentence him to life imprisonment." The State then withdrew its notice of intent to seek the death penalty, and the court imposed a life sentence for the defendant on the first degree murder conviction.

## ANALYSIS

### I. Identification of Defendant by Mrs. Cook

As to this issue, the defendant argues that: (A) the hypnotically influenced testimony of Mrs. Cook should have been suppressed; (B) the circumstances surrounding the showing of the 2000 newspaper article to Mrs. Cook amounted to an "impermissible, overly suggestive show-up"; (C) the 1990 photograph shown to Mrs. Cook by the prosecutor before the second day of trial was overly suggestive; and (D) the testimony of an expert witness concerning the circumstances of his identification by Mrs. Cook should have been admitted. We will review these claims.

### A. Identification Influenced by Hypnosis

The defendant asserts that hypnotically refreshed testimony, which "inflates the confidence" of the witness, is inadmissible and violates due process if there is no contemporaneous recording made of the hypnosis session and that such testimony is inadmissible pursuant to Rule 702 of the Tennessee Rules of Evidence.

In State v. Glebock, 616 S.W.2d 897, 903 (Tenn. Crim. App. 1981), we adopted the view of hypnosis evidence enunciated in United States v. Adams, 581 F.2d 193, 198 (9th Cir. 1978), that the "fact of hypnosis affects credibility but not admissibility" and explained the standards regarding such evidence:

> "We think that, at a minimum, complete stenographic records of interviews of hypnotized persons who later testify should be maintained. Only if the judge, jury, and the opponent know who was present, questions that were asked, and the witness's responses can the matter be dealt with effectively. An audio or video recording of the interview would be helpful."
>
> . . . .
>
> In laying the foundation for the admission of the testimony from a witness whose memory was refreshed by hypnosis, the expert should describe the manner in which he conducted the hypnotic session without relating to the jury what the witness had told him during hypnosis. The expert witness should also be asked to testify as to whether one under hypnosis has an increased capacity for recollection, what could bring on confabulation, and whether one who is or has been hypnotized has the capacity for telling deliberate falsehoods or lies.

Glebock, 616 S.W.2d at 904-05 (quoting Adams, 581 F.2d at 199 n.12) (footnote omitted).

In this matter, the trial court held an evidentiary hearing on the defendant's pretrial motion to suppress the hypnotically influenced testimony of Mrs. Cook, at which she, Dale Sternberg, and Dr. Michael Nash testified. Mrs. Cook said that, after the murder of her husband, she returned to her home in Wisconsin where she began counseling, which eventually lead to hypnosis therapy. She explained why she attended the therapy sessions:

Q      Were there times that you would awaken in the night and see an image of a face?

A      Yes.

Q      Would that image stay with you?

A      It would come and it would go. It was – part of it is – was trying – wanting to try to forget what happened, but it was an image that has always been with me.

Q      And the image that you would see was that of the face of the person who had killed your husband?

A      That's correct.

-10-

Q      How was this making you feel that you couldn't retain that image consciously?

A      I felt really helpless. I really felt like I wanted to do something so that no one else would ever have to deal with that same person in this area. I really felt I need to try to – try to do a police artist sketch.

. . . .

Q      All right. Now, when you undertook to go through hypnosis, was – what was the purpose of doing this?

A      To see if I could recall anything else. Through all the trauma that I had been through, I wanted to know if there was anything else that I had blocked out, and I felt that it could help.

. . . .

Q      Can you remember what was happening in the sessions?

A       Yes.

Q      How would you describe to his Honor what these sessions entailed? What do you remember about them?

A      I remember them as being a form of relaxation and concentration. There was never ever a time that I was not aware of – of my total surroundings.

Q      We've seen these things, all of us have, on TV about hypnosis where somebody snaps their fingers and a person turns in – acts like a chicken. Was it anything like that?

A      It's – it was nothing like that. It was in a clinical situation, and I guess the word "hypnosis" isn't really even comparable to what I – what I feel that I underwent through therapy. To me, it was another therapy session.

Q      Okay. And during these sessions, do you recall at any point in time there being a suggestion to you of an answer that you should give?

A      Never.

. . . .

-11-

Q      Ultimately, whose decision was this to undergo hypnosis?

A      My own.

Q      And at any point in time did anyone with law enforcement, either in Wisconsin or here in Tennessee, have anything to do with your decision to undergo hypnosis?

A      No.  It was my own decision.

On cross-examination, Mrs. Cook gave additional details of the hypnosis therapy and the tape recordings made of the sessions:

Q      Let's go back to '91, Ms. Cook, and the hypnosis itself.  At the point that you decided that this would be a good idea, your purpose was to resurrect your memory about these events, correct?

A      My purpose was to see if I could recall anything else that would help the Knoxville police in the case.

Q      And at that time you were kind of drawing a mental block about the features in any detail?

A      I don't think I would use the word, "mental block."

Q      What would you say was –

A      Well, I would say that I've had a vivid description.  It has never changed.  I was just hopeful that I would be – something else that I would be able to recall.

. . . .

Q      The tape that you have – that's been introduced, Ms. Cook, those are the only sessions that were taped; is that correct?

A      To my knowledge.

Q      Now, there were other sessions that you had, other than those on the tape?

A      Yes.

Q      In fact, the tape is only two of the sessions, I believe?

-12-

A       I'm not certain how many sessions that is.

Q       Okay.  Have you listened to the tape recently?

A       Yes, I have.  I listened to it after I found it.

Q        And you would agree it's not the – it doesn't cover the entire universe of your sessions with Mr. Sternberg?

A       It does not cover the entire sessions.  It does not cover all of the sessions.

        THE COURT: Does it cover all of the sessions during which you were hypnotized?

        THE WITNESS: Yes, I believe it does.

Q       It's your understanding that the tape covers all the sessions –

A       No, no.  Does not.

Q       – that you were hypnotized?

A       I don't – I don't know that.  I don't recall that.

At the end of her testimony, the court questioned Mrs. Cook concerning the hypnosis:

THE COURT: You testified earlier that you would have images in your mind while you were dreaming; is that correct?

THE WITNESS: That's correct.  I would have nightmares at night.

THE COURT: And I thought I heard you testify that you could not duplicate that image when you were conscious; is that – is that incorrect?

THE WITNESS: That is incorrect.

THE COURT: So you've always been able to, whether in a dream or consciously, picture the image –

THE WITNESS: The image has always been the same.

THE COURT: And the purpose of the . . . hypnosis, then, was not to re-create or reconstruct this image. It was to try to refine it?

THE WITNESS: That's correct.

Shortly after the final hypnosis session, Mrs. Cook met with a police sketch artist with the Wausau Police Department, who prepared a sketch of the suspect to be released to law enforcement agencies.

Dale Sternberg, the clinical social worker who conducted Mrs. Cook's hypnosis sessions, testified that he had "approximately 50 hours of training" in hypnosis therapy and hypnotized people, usually on "referral from a physician and usually related to medical concerns," a couple of times a month. He said that hypnosis was not his primary practice but a tool he used, and he was not a "hypnotherapist per se" who hypnotized patients in order to have them regress "or anything like that." Instead, he worked more on "symptom management." Sternberg testified that Dr. Stanton referred Mrs. Cook to him and said:

> [S]he was referring [Mrs. Cook] because she was blanking out on – or repressing memories of this person's face, and she thought maybe hypnosis might assist her in getting – in recalling a clearer image and that that would be very helpful to her in her recovery and her treatment, to do whatever she could to assist the police[.]

Sternberg was also asked about the hypnosis sessions he had with Mrs. Cook:

Q       Well, were you also in tune with – what happens to a person when they reach a level of, say, light hypnosis? Do they have the increased capacity for recollection?

A       I believe they do, yes. Uh-huh.

Q       Do they have – is there an increased capacity for suggestion?

A       I believe so, yes. Uh-huh.

Q       Were you always conscious of that fact and careful in how you questioned?

A       Well, particularly in a case like this, because it was so important that if she were to – whatever she was recalling, she recall something accurately. So I wanted to be careful not to plant any seeds or lead her or pressure her into a description of something that may not have been, you know.

Q       And in undertaking that, have you had occasion to listen to the tapes . . . of the session?

A        Yes, uh-huh, just yesterday.

Q        And in those tapes, do you recall at any point in time ever suggesting an answer to Ms. Cook that she accepted?

A        No.  There was none that I – there were a couple of times where I thought I had suggested something, as I listened to that, but they were not accepted by her.

Q        She, in fact, said, no, that wasn't the way it was?

A        Yeah, right.  Uh-huh.  Was one had to do with the person's eyebrows.  I think I raised the question, "Did he have bushy eyebrows?"  And she said, "No," or something like this. . . .

Q        How would you describe the level of hypnosis that . . . Ms. Cook was placed under?

A        I don't know that I could.  I'm not sure that I can at this point.

Q        Was it a deep, heavy hypnosis?

A        Oh, no.  It would be a light hypnosis, somewhere between relaxation and a light hypnosis.

The summary notes taken by Sternberg during these sessions showed that he met with Mrs. Cook six times between August 19, 1991, and October 15, 1991, and that she was placed into some state of hypnosis during four of these sessions.  Of those, the notes showed that two of the sessions were audiotaped "for her use."  Sternberg testified that during the two hypnosis sessions that were not taped, he only questioned Mrs. Cook concerning the details of her trip before leaving Wisconsin and that the other two hypnosis sessions, dealing with the events in Knoxville on the day of the murder, were taped:

Q        Was that session a session wherein you and she discussed the events that occurred to her in Tennessee?

A        Yes.  That's when – when she came back, she was comfortable in continuing and wanted to continue, and then we picked up on the trip.  We had left off in Madison where she had left her son, and they were going to proceed on the trip, and during this session, then, we continued the trip.

Q        And that particular session was the first session that you and she had discussed the events in Tennessee, the actual events that occurred when her husband got murdered, correct?

-15-

A        I believe so.  There may have been some discussion of why she was there, in the early part, but I don't recall it necessarily was the case.

Q        I didn't ask that very well.  Was this the first time that she, under hypnosis, had discussed the events that occurred in Tennessee?

A        Yes.  Uh-huh.

Q        And that was tape-recorded; is that correct?

A        Yes.  Uh-huh.

. . . .

Q        What is the next session that occurred?

A        September 20th, 1991.

Q        And once again, was there discussion while she was under hypnosis about the events that occurred in Tennessee?

A        Yes. Uh-huh.

Q        And, once again, was that session taped?

A        Yes.

On cross-examination, Sternberg was asked about the view that hypnosis enhances the hypnotized individual's confidence in memory recall:

Q        And would you agree the literature indicates that hypnosis can increase errors while also falsely increasing an individual's confidence in his or her recollections?

A        Well, again, I recall some of the material that I read at that time presenting both sides of that, that – yeah, there was an article I think – I believe his name was Ehrlinger who stated that people that had been under significant stress were often the best candidates for obtaining, you know, accurate recall of that information.  I also recall – I think his name was Orne – writing much – a position much similar to what you're describing.  So I remember it being – you know, kind of having two sides.

. . . .

-16-

Q	When a subject comes out of a hypnotic session and has certain recall, when people emerge from that hypnosis, are they more certain of their content of what they have said than when they went into hypnosis?

A	I can't answer that because the nature of my practice really didn't allow that kind of an experience. [Mrs. Cook] was somebody that I hypnotized for the – her therapist, but I wasn't doing that on a regular basis where I can say that it increased her confidence or didn't increase her confidence.

Sternberg said that the two audiotapes of the hypnosis sessions in which the events in Tennessee were recalled were not complete and apparently the "induction" parts, the procedures used to actually hypnotize Mrs. Cook, were not recorded even though it was his general practice to do so "from the minute we started to the minute we stopped."

Dr. Michael Nash, professor of psychology at the University of Tennessee, testified at the hearing as an expert witness for the defense on the subject of hypnosis. He explained there were three basic dangers with hypnosis – hypersuggestibility, confabulation, and inflated confidence. His main concern with Mrs. Cook's testimony was her inflated confidence: "[T]here's a good chance that Ms. Cook's confidence in the accuracy of her memory was inflated by the procedures over a number of sessions that took place prior to . . . the sketch that was done." He explained this view:

[W]hat happens is that over a course of hypnosis where reasonably good hypnotic subjects are hypnotized and told that they can envision something happening, whether it's remote, whether it's . . . recent, they come to believe that they can, believe it or not, and after hypnosis is over, these patients tend to have an – an inflated sense of confidence in their memory.

Dr. Nash testified that one who has a sense of inflated confidence might ask herself the question, "Given what I know, can I really identify someone confidently?" and after hypnosis, the answer to that question "is more likely to be yes." He also said that "confident people come across more compellingly to juries, and I guess to judges as well, and that's . . . another problem with hypnosis."

On cross-examination, the State asked Dr. Nash to identify a fact showing that Mrs. Cook's confidence level increased because of the hypnosis sessions:

Q	Okay. I want you to . . . point out for me one factor, please, Dr. Nash, one single fact that you found in your investigation and research wherein Ms. Cook has had her confidence enhanced as a consequence of this hypnosis.

A	I think you misunderstand the notion of confidence here. We're talking about confidence, broad spectrum. I'm not talking about facts that have changed. I hope I've already established that of the three problems with hypnosis what I'm most concerned about in this case is the confidence problem. So . . . the overvaluation or

-17-

the overestimate of . . . the accuracy of her own memory is the issue. That's broad spectrum. There's no detail that . . . I'm speaking of really.

We will review the trial court's denial of the motion to suppress the identification of the defendant by Mrs. Cook.

On the day of the crimes, March 23, 1991, when Mrs. Cook was interviewed by Detective Bundren, she described the assailant in detail:

> A white male, very young, 17 yrs old or younger, no older than 22 years, very fair complexion, very straight nose, sharp pointed features, appeared that he hadn't started shaving yet, slender build, 140 lbs, and about 5'5" tall. He had medium brown hair with about 3 inches hanging down in back below the bandana. The bandana was olive green in color and he wore it over his eyebrows and across the top of his ears. He had on all dark clothing. A light weight cotton type jacket, maybe navy blue in color, and he had on ski type heavy gloves. He was armed with a .22 cal. weapon.

Mrs. Cook met with the police sketch artist on October 11, 1991, shortly after she had completed the hypnosis sessions, and described the assailant in almost identical terms:

> [A] young male, white between the ages of 17-22 yrs. She stressed that he was fine featured, slight of frame, had smooth, light complected skin with no scars or visible acne. She said that he was not tall, giving his height as between 505-506 and his weight in the range of 125-140 lbs, with medium brown hair showing at the neck from under a camouflage green bandana which was tied over and around his entire forehead, being fastened at the lower back of his head. . . . She stressed his young appear[a]nce and further said that his features were almost feminine. . . . Regarding the suspect[']s attire she said that beyond the camo green headgear she thought he had on a waist length, dark coloured [sic], zippered jacket. She said also that she remembered that the suspect wore gloves which she described as a rather thin, black leather glove that was either unlined or rather lightly lined.

The defendant relies primarily on the holding of this court in Glebock as his basis for arguing that the trial court should have suppressed Mrs. Cook's identification of the defendant. In that case, the victim was shot several times at close range by a man whom she identified, while still at the scene, as her ex-husband, Ed Glebock. Glebock, 616 S.W.2d at 902. Approximately three months after the attack, the victim was hypnotized, refreshing her memory of "minor details" of the attack. Id. The defendant asserted that the hypnosis of the victim rendered her testimony incompetent. We disagreed, concluding that her testimony was admissible even though parts of her memory were recalled or induced through pretrial hypnosis, the facts the victim recalled being unrelated to the defendant's guilt or innocence:

-18-

[T]he facts remembered by the victim as a result of the hypnosis did not affect the result of the trial. Before she was taken from the scene of the crime, she described the pertinent facts to the people who gathered about her while she was lying on the parking lot. She identified the defendant by name as being the assailant. She gave the bystanders a description of him and told them that he was in a black van. She knew that he had his right hand in a sack, although she thought at the time that he "hit her" with the sack. She apparently was not aware at the time of the fact that she had been shot. Her added recollection after hypnosis revealed the presence of another man, radio equipment being in the van, and other matters unrelated to the defendant's guilt or innocence. We find that the facts recalled by the witness after hypnosis to which she testified did not affect the judgment or result in prejudice to the judicial process. See Rule 36(b), T.R.A.P.

There was sufficient evidence upon which a rational trier of fact could be convinced of the defendant's guilt beyond a reasonable doubt. Rule 13(e), T.R.A.P., Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979).

Id. at 905.

There is nothing in the record to show that the hypnosis of Mrs. Cook brought out previously unremembered key facts or brought to her mind a description of the assailant that did not exist before. On the day of the murder, Mrs. Cook gave a detailed description of the defendant. She was provided at least one set of photographs and one videotape of potential suspects, neither of which included the defendant, and she did not make an identification from either group.

In Beck v. Norris, 801 F.2d 242 (6th Cir. 1986), the United States Court of Appeals for the Sixth Circuit, in applying Tennessee law as to the admissibility of hypnosis evidence, analyzed a set of facts similar to those of the present case. There, five eyewitnesses to an armed robbery and second degree murder gave descriptions of the suspect to the police. Id. at 243. Later that day, they participated in the drawing of a composite, which was circulated to law enforcement. Within a few days, each of the witnesses was individually hypnotized by an investigative hypnotist in "an attempt to elicit any additional details concerning the crime." Id. After the hypnosis sessions, the witnesses participated in the preparation of a second composite, resulting in the identification of the defendant by an inmate in the local county jail. Id. The defendant asserted he was denied a fair trial and due process. The court disagreed with the defendant's claim that the hypnosis session had caused the witnesses to identify him as one of the assailants:

We cannot agree that under the circumstances presented here the use of testimony of witnesses who had been hypnotized deprived defendant of a fair trial. First, there is evidence to refute defendant's claim of undue suggestibility. For instance, the composite drawings made before the hypnosis session and after the hypnosis session were very similar. Although the hypnosis apparently aided in

-19-

sharpening the drawing of petitioner, the similarity between the two drawings indicates that the second composite was not the product of suggestibility. Indeed, there was no motivation to influence the hypnotized subjects, as no suspect for the crime had yet been identified. Second, on the evening of the crime, the witnesses individually viewed a photographic array consisting of approximately 100 photographs of possible suspects. Petitioner's photograph was not included in the array. The witnesses made no identification at that time. Finally, another witness . . . was not subjected to hypnosis and did not participate in the identification procedures utilized with the crime witnesses. She identified petitioner as the man she saw run from the entrance of the motel immediately after the commission of the crimes.

Id. at 244.

The trial court denied the defendant's motion to suppress Mrs. Cook's identification of the defendant, noting the closeness of the description of the suspect given to police on March 23, 1991, and the description given post-hypnosis to the sketch artist on October 11, 1991. The court concluded that "[w]hile the level of certainty demonstrated by the victim could have been affected by hypnosis, the victim's actual description of the assailant remained remarkably consistent and unchanged after undergoing hypnosis." Additionally, the court noted that "no state agents were involved in the victim's undergoing hypnotic therapy," and therefore, the defendant's due process rights were not violated. The trial court did not address the issue of whether the hypnotic sessions were properly audiotaped.[5]

In State v. Robinson, 146 S.W.3d 469, 516 (Tenn. 2004), pet. for cert. filed (Jan. 31, 2005), our supreme court set out the numerous authorities as to the standard of review to be applied in an appellate review of the trial court's ruling on a motion to suppress:

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. State v. Cribbs, 967 S.W.2d 773, 795 (Tenn.), cert. denied, 525 U.S. 932, 119 S. Ct. 343, 142 L. Ed. 2d 283 (1998).

---

[5]The defendant filed his motion to suppress Mrs. Cook's hypnotically influenced testimony on April 12, 2002, asserting that no contemporaneous recordings had been made of the sessions. Apparently, however, by the time of the pretrial hearing on June 20, 2002, Mrs. Cook had found the audiotape of the sessions. We assume the trial court considered this issue resolved at the time of the hearing.

On appeal, in response to the trial court's observation during the hearing on the motion for new trial that the sessions she underwent with the hypnotist never "really had much impact on her," the defendant summarizes his argument as to this issue by asserting:

> [W]hile the majority of Yvonne Cook's account of what occurred on March 21, 1991 did not change after hypnosis, the trial court disregarded the fact that Yvonne Cook's confidence in her ability to make an identification, and her confidence in her recall of events, had been greatly enhanced as a result of the hypnosis. Therefore, her testimony was influenced by hypnosis, and the standards set forth in Glebock and Tenn. R. Evid. 702 applied.

We respectfully disagree both with this analysis and conclusion. First, we disagree with the defendant's characterizing the issue as the use of "hypnotically refreshed" testimony. In fact, as the trial court correctly noted, Mrs. Cook, even before the hypnosis sessions, gave detailed and accurate descriptions of the defendant, rather than filling in details of the incident itself as occurred in Glebock although the additional details there were not relevant to guilt or innocence. As for the defendant's claim that hypnosis "greatly enhanced" the confidence of Mrs. Cook "in her recall of events," this simply is his view. The trial court did not find this had occurred, and there is no basis for our doing so either. Since, according to Mr. Sternberg, the only unrecorded portion of the hypnosis sessions as to events in Tennessee was the "induction" part, where she actually was being hypnotized, we would be speculating were we to conclude anything occurred during this time that affected the defendant's right to due process of law.[6] Accordingly, we conclude that the defendant's arguments as to this issue are without merit.

Even if we were to exclude the entire testimony of Mrs. Cook, the fact would remain that the most incriminating testimony at trial came from two witnesses who were not subjected to hypnosis, Ernest Salyer and Loretta Strange. On several occasions, the defendant admitted the killing to both. He told Salyer on the day of the murder that he had "killed somebody" and had "shot in a vehicle, jumped in it and drove them" away. He told Strange, "The guy on the interstate, I did that," "This is where I killed that guy," "I shot at cars, and I hit somebody," and he "had killed someone once before, and he could do it again." Even had Mrs. Cook's testimony been suppressed, the evidence still was sufficient for a rational jury to be convinced of the defendant's guilt beyond a reasonable doubt and, accordingly, it will not be disturbed. Tenn. R. App. P. 13(e). Nor are we convinced that any part of Mrs. Cook's "hypnotically refreshed" testimony affected the judgment or resulted in prejudice to the judicial process. Tenn. R. App. P. 36(b). The record supports the trial court's denial of the motion to suppress the identification of the defendant by Mrs. Cook.

---

[6]Although the defendant relies on Abdur'Rahman v. Bell, 999 F. Supp. 1073 (M.D. Tenn. 1998), to argue that "the testimony of a witness whose memory has been hypnotically refreshed is so unreliable as to render it inadmissible," pursuant to Tennessee Rule of Evidence 702, we do not find that case helpful to his claims in this matter. In Rahman, the statements under hypnosis, by contrast, were those of the defendant and were self-serving, as to his attempt to overturn his sentence of death, the court noting "that there is no way to determine whether the statements made by the Petitioner while under hypnosis are objective fact." Id. at 1087 n.18.

## B. Newspaper Photograph

The defendant contends that Mrs. Cook's viewing of his 2000 newspaper photograph, and her subsequent certainty that he was the assailant, amounted to an impermissible, overly suggestive show-up, which was made even more so by the fact that nine years earlier Mrs. Cook had undergone hypnosis that inflated her confidence. Because the newspaper photograph was not part of a photographic array, he argues that Mrs. Cook's identification of him pretrial was inadmissible and she should not have been allowed to make an in-court identification.

Noting that the "friend of an acquaintance," and not a law enforcement official, sent Mrs. Cook the newspaper photograph, the trial court denied the defendant's pretrial motion to suppress Mrs. Cook's testimony, relying on this court's holding in Bishop v. State, 582 S.W.2d 86 (Tenn. Crim. App. 1979). In that case, we held that there was no due process violation because there was no state action where a witness identified a defendant to police based on a single photograph appearing in a newspaper. Subsequent to the trial court's original order, the Tennessee Supreme Court, in State v. Reid, 91 S.W.3d 247 (Tenn. 2002), approved of the Bishop holding. In Reid, two witnesses, who saw the defendant on television news reports after he was arrested, "immediately" and "instantly" recognized the defendant as the person they had seen at the scene of the crime and called the police to report the identification. 91 S.W.3d at 271. The defendant challenged their testimony in a pretrial suppression motion, arguing that the "procedures leading to their identifications of the defendant were unduly suggestive and violated his due process rights." Id. Our supreme court disagreed, holding that because the viewing was "not orchestrated by police," and "[a]bsent evidence of state involvement in [the witnesses'] identifications of the defendant, constitutional due process is not implicated." Id. at 272-73. We note that, in this regard, Tennessee follows the majority view, "[t]he majority of courts require that an allegedly suggestive pretrial encounter be the result of either police or prosecution action to have an effect on the admissibility of in-court identification. These courts reason that without government involvement there is no violation of a defendant's constitutional due process rights." Annotation, "Admissibility of In-Court Identification as Affected by Pretrial Encounter That Was Not Result of Action by Police, Prosecutors, and the Like," 86 A.L.R. 5th 463 (2001). Likewise, in the present case, based on our reasoning in Bishop and the supreme court's affirmance in Reid, we agree that because there was no state action involved in the showing of the newspaper photograph to Mrs. Cook, this issue is without merit.[7]

On appeal, the defendant argues that we should apply the factors set out in Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375 (1972), which were adopted by the Tennessee Supreme Court in Bennett

---

[7]On appeal, the defendant argues that this court is bound by Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir. 1986), where the court held that the fact a pretrial witness-defendant "encounter" was not the result of "police machinations" was not determinative of whether the encounter was unduly suggestive. This holding represents a minority view and is contrary to the decision of our supreme court in Reid, by which we are bound. Additionally, the cases may be distinguished factually, the proof in the present appeal showing that Mrs. Cook paid greater attention and had a much better opportunity to view, and for a longer period, than did the witness in Thigpen.

v. State, 530 S.W.2d 511 (Tenn. 1975), to determine whether the victim's view of the newspaper photograph tainted her in-court identification. The relevant factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Bennett, 530 S.W.2d at 514. In Bennett, the rape victim was shown a photograph of the suspect by the police immediately before she picked him out of a line-up. When she was shown the photograph, she was told only that he was a suspect. By the time of the line-up, the defendant had altered his appearance by growing a mustache and chin whiskers, whereas at the time of the rape he was clean-shaven. Id. at 512. At the time of the crime, the victim had an opportunity to view the suspect in a hotel room illuminated by the television and a bathroom light and while he had a gun pointed at her child. The court applied the factors set out in Biggers and determined that "[t]he identification procedure squares with the criteria established in Neil v. Biggers," the victim was no "casual observer" but instead testified that she "got a good look at him" and her "description of the defendant was full and accurate." Id. at 514-15. In Bennett, nine days had lapsed between the date of the crime and the date of the identification.

The Bennett court also adopted the "totality of the circumstances" rule as set forth in Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968), in which the Court held:

> [E]ach case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

In analyzing the case before it, the Bennett court determined that "we have examined the record and find that there is substantial other testimony to validate the identification of the defendant as being the culprit who committed the crime of robbery and rape in this case." 530 S.W.2d at 515. The court held that although "the use of the photograph in this case, immediately prior to a line-up was improper and erroneous," such use did not violate due process because of the totality of the circumstances and the application of the five Biggers factors. Id.

The defendant in the present appeal argued in his supplemental motion to suppress Mrs. Cook's testimony that her seeing the single newspaper photograph amounted to an "unconstitutional photographic show-up that presents the danger of irreparable misidentification in violation of the due process provisions" and that this was aggravated by the fact that she had undergone hypnosis, inflating her confidence in her identification. The trial court applied the Biggers factors and disagreed with the defendant's argument, concluding that the victim's viewing of the newspaper photograph did not prevent her identifying the defendant at trial:

> While the first three factors do not weigh in favor of the defendant's argument, the level of certainty factor as well as the elapsed time factor arguably

weigh in favor of suppression.  The evidence presented at the evidentiary hearing shows that the victim had ample opportunity to observe the assailant under favorable lighting conditions.  The victim testified in detail regarding her efforts to observe the assailant and note details of his physical description.  The victim also remained consistent in her descriptions of the assailant and the accuracy of these descriptions to the actual physical characteristics of the defendant is consistent.  While the level of certainty demonstrated by the victim could have been affected by hypnosis, the victim's actual description of the assailant remained remarkably consistent and unchanged after undergoing hypnosis.  Relative to the elapsed time between the offense and the identification, the court notes that the victim has never viewed a photograph of the defendant as he appeared in 1991 at the time of the offense.  In applying the Biggers factors to this identification, the court concludes that the procedure was not so impermissibly suggestive as to deny the defendant due process by creating a substantial likelihood of misidentification.  The court will certainly allow the defendant the opportunity to fully cross examine Mrs. Cook before the trier of fact who will ultimately judge the credibility of any identification.

We agree with the trial court that the Biggers factors adopted by the court in Bennett have been satisfied in this case.  We further hold that under the "totality of the circumstances" test also set forth in Bennett, there is "substantial other testimony to validate the identification of the defendant as being the culprit who committed the crime[s]" against the victims in this case, primarily the testimony of Ernest Salyer and Loretta Strange.  Accordingly, this issue is without merit.

### C.  1990 Photograph

At the close of the first day of testimony in the trial, the State ended its direct examination of Mrs. Cook.  When the trial resumed the following morning, the court allowed the State to ask Mrs. Cook a few more questions before cross-examination.  Over objection by the defense that the photograph was a prejudicial "one-person show-up of the defendant," the trial court, in a jury-out hearing, allowed Mrs. Cook to view the 1990 photograph of the defendant.  She responded affirmatively when asked if the photograph showed the defendant "close to the way he appeared" at the time of the crimes.  Mrs. Cook also testified that the first time she had seen the 1990 photograph was that morning in the prosecutor's office after having identified the defendant in court the day before.  On cross-examination, with the jury out, Mrs. Cook testified again concerning the circumstances of being shown the 1990 photograph.  The defense again objected to the introduction of the photograph, and the trial court overruled the objection and allowed the 1990 photograph to be introduced.  The State then resumed questioning Mrs. Cook about the photograph with the jury in the courtroom, and she was also cross-examined about it.  At that time, the defense showed Mrs. Cook the 1991 photograph of the defendant, taken three weeks before the crimes, and questioned her concerning the defendant's appearance in that photograph.  The 1991 photograph showed the defendant with "black" hair and "facial hair," whereas the 1990 photograph showed the defendant with brown hair and no facial hair.

On appeal, the defendant argues that Mrs. Cook's "in-court identification was tainted by this unconstitutional show up," the 1990 photograph was overly suggestive, and her identification should not have been admitted. As we will explain, we disagree with the defendant.

Before she was shown the photograph, Mrs. Cook had identified the defendant in court, on the first day of trial, as the person who committed the crimes against her and her husband:

Q      Come to the center of the courtroom, please.

A      (Complies.)

Q      And I would ask if you would look around the entirety of the courtroom and do you see the person in here –

A      Yes, I do.

. . . .

Q      Would you walk to the front of that person and point at them, please.

A      You're the person that murdered my husband.

Q      Please point.

A      (Complies.)

. . . .

Q      Is this the person who shot and killed your husband?

A      Yes.

. . . .

Q      Did any of the photographs that law enforcement officers brought you to look at, the lineups, affect your identification?

A      No.  He was never in any of those photographs.

Q      And the newspaper article that you received in the mail with the photograph of the defendant, did that affect your identification?

A      No.

Q        Is your identification in the courtroom based on seeing [the defendant] at the time that he killed your husband and kidnapped you or based upon seeing the photograph?

A        It's based on the incident.

From this exchange, it appears that the prosecution was simply attempting to use the 1990 photograph to illustrate what the defendant looked like at the time of the murder. The defendant also contends that the State should have utilized the March 1991 photograph instead, because it was taken closer in time to the date of the crimes. We agree that the trial court properly allowed the defendant to enter the 1991 photograph into evidence in an effort to question the credibility of the witness's identification of the 1990 photograph as being the one showing the defendant's appearance at the time of the crimes. Accordingly, we cannot conclude that the trial court abused its discretion as to this ruling.

### D.  Excluded Expert Testimony

In considering this issue, we first will review the manner in which it developed at the trial.

The defendant filed a notice of his intent to present at trial the expert testimony of Dr. Elizabeth Loftus, Ph.D., professor of psychology at the University of California, who would testify as to "the factors affecting the identification made by Yvonne Cook." The State responded by filing a motion in limine, asserting that the testimony of Dr. Loftus was inadmissible pursuant to the holding of our supreme court in State v. Coley, 32 S.W.3d 831 (Tenn. 2000), as to eyewitness testimony. Replying to that argument, the defendant argued that the "identification of the defendant by Yvonne Cook present[ed] specific and unique problems," consisting of the gap in time between the crimes and her identification of the defendant, the use of hypnosis, and her seeing a news article and photograph of the defendant prior to her identification of him. Thus, applying Coley, the defendant argued that the opinion testimony of Dr. Loftus was "permissible to substantially assist the trier of fact."

As requested by the trial court, the defendant filed a two-page memorandum prepared by Dr. Loftus, summarizing the testimony which she would present at trial. According to the memorandum, there were "factors present in the current case that are known to create problems for accurate eyewitness testimony," and she would be prepared to testify about the "workings of human memory," the effects of factors such as suggestions on memory, and the creation and characteristics of false memories. She would identify and explain "factors that are important in the current case," such as the nine-year passage of time between the crimes and the identification, resulting in Mrs. Cook's memory fading and her becoming "more vulnerable to suggestive influences," and the "highly suggestive" procedure of her "viewing a single photo [of the defendant] in a news article," which would increase her confidence in the identification of the defendant. Dr. Loftus described this as "[t]he phenomenon of 'photo-biased identification' [which] has been described in the

psychological literature." She said that "[a]nother very important factor is what is called the confidence factor," meaning that "even if Mrs. Cook is expressing confidence in her current account, this does not mean she is accurate. Her confidence level could be influenced by many factors, e.g., viewing prior photos, or being hypnotized." Dr. Loftus concluded her opinion, saying, "Many of the factors that I would discuss are not clearly understood by jurors, and some are even in conflict with misconceptions that jurors have about the workings of memory, which is precisely why this sort of testimony can be helpful to jurors."

The trial court then conducted an evidentiary hearing on November 13, 2002, at which Dr. Loftus participated by telephone and was questioned by counsel for both sides. Subsequently, applying the holdings of our supreme court in Coley and McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997), the trial court ruled that the testimony of Dr. Loftus was inadmissible:

> The proffered testimony of Dr. Loftus is remarkably similar to the testimony considered in the Coley case. Specifically, Dr. Loftus' opinion included information regarding the process of identification, the relationship of stress to memory, the difference between confidence in identification and actual accuracy of identification, the effect of passage of time on the identification and the suggestibility of [the] photograph presented to the witness in this case. The only significant difference between the testimony proffered in this case and that of Coley is that there is no cross-racial consideration presented in this case. The court did not find anything in Dr. Loftus' testimony to be of a more specific nature than that addressed in Coley. Therefore, the court finds that the evidence is per se inadmissible.

On appeal, the defendant disputes that the proffered testimony of Dr. Loftus was "remarkably similar" to that which the Coley court had determined was not admissible, listing areas in which, according to the defendant, that of Dr. Loftus was substantially more particularized. To differentiate these matters, the defendant notes that Dr. Loftus reviewed certain of the records of this case, including the police reports, hypnosis information, and statements of Yvonne Cook; that her testimony was particularized as to Yvonne Cook, in that she "discussed how the stress and fright, particularly a phenomenon known as weapon focus, could impair the memory of Yvonne Cook," and the effect of the "long time interval" on her identification of the defendant; and these and other matters she discussed were "associated with unreliable memory." Thus, according to the defendant, the testimony of Dr. Loftus "would have substantially assisted the trier of fact in determining the appropriate weight to be accorded" Yvonne Cook's identification of the defendant and was admissible under both Coley and Tennessee Rule of Evidence 702.

The trial court is given broad discretion in resolving questions concerning the admissibility of expert testimony, and we will not overturn its ruling absent a finding that it abused its discretion. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002), cert. denied, 537 U.S. 1115, 123 S. Ct. 873, 154 L. Ed. 2d 790 (2003); Coley, 32 S.W.3d at 833; State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or

reasoning that caused an injustice to the party complaining.'" Coley, 32 S.W.3d at 833 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

In Coley, the defendant entered an ice cream shop in the early afternoon, placed an order, produced a pistol, and ordered a store employee to put the store's money into a bag. He then ordered the two female employees into a walk-in freezer, where they remained until their release by a customer. No physical evidence was recovered at the crime scene. The employees gave similar descriptions of the robber; and, nine days later, one identified his picture from a photographic line-up. Five months after the robbery, the other employee viewed the same photographic line-up and also identified the defendant as the robber. At trial, the defendant proceeded with an alibi defense and sought to present the testimony of Dr. Michael G. Johnson, an "expert in the field of eyewitness identification." Id. at 832-33. Although not allowed to testify, Dr. Johnson made a proffer of his proposed testimony, which consisted of information as to (1) the eyewitness identification process; (2) "the relationship between stress and memory;" (3) "cross-racial identification;" (4) the confidence of a witness in an identification compared to its accuracy; (5) "the effect of time on the accuracy of memory;" and (6) "the suggestibility of the photographic line-up" from which Coley was identified. Id. at 833. On appeal, the court concluded initially that this expert testimony regarding eyewitness identification would not have assisted the jury in its determination:

> Here, as in Ballard, we are presented with testimony of a general nature designed to affect the juror's decision on the credibility of witnesses. Using the Ballard rationale, expert testimony concerning eyewitness identification "solicits the danger of undue prejudice or confusing the issues or misleading the jury. . . ." [855 S.W.2d] at 561. As a result, it may "lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert," rather than "assist" the jury in making its own determination of credibility. See Id.

Id. at 835.

Concluding that expert opinion regarding eyewitness testimony is unnecessary and may mislead and confuse the jury, the Coley court explained why it was not reliable:

> We find that expert testimony concerning eyewitness identification simply offers generalities and is not specific to the witness whose testimony is in question. Moreover, we are of the opinion that the subject of the reliability of eyewitness identification is within the common understanding of reasonable persons. Therefore, such expert testimony is unnecessary. It may mislead and confuse, and it could encourage the jury to abandon its responsibility as fact-finder. Such responsibility is a task reserved for and ably performed by the jury, aided by skillful cross-examination and the jury instruction promulgated in [State v.] Dyle, [899 S.W.2d 607 (Tenn. 1995)], when appropriate. For these reasons, we find that general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does

not substantially assist the trier of fact. Thus, we hold that such testimony is inadmissible under Tenn. R. Evid. 702 and that the trial court, therefore, properly excluded Johnson's testimony.

Id. at 837-38.

In his reply brief, the defendant argues that in State v. Christopher Kevan Hein, No. E2003-01793-CCA-R3-CD, 2004 WL 1269304 (Tenn. Crim. App. June 9, 2004), perm. to appeal denied (Tenn. Oct. 11, 2004), this court held that "expert testimony which is particularized to the eyewitness testimony is admissible." Further, he notes that if Coley adopted a per se rule against any expert witness testimony, "then surely the Chief Justice would not have authorized funding for the hiring of Dr. Loftus by the defense."

The defendant in the present appeal provided his expert with information about the case, including police reports and statements Mrs. Cook had made to police officers. Thus, by his view, the testimony of his expert witness was specific to the identification of the defendant by Mrs. Cook. However, even this approach does not deal with the rationale of Coley for concluding that expert testimony as to problems with eyewitness identification is per se inadmissible. First, we note that Coley specifically explains that while Federal Rule of Evidence 702 and a minority of states allow expert testimony that "assist[s] the trier of fact," Tennessee Rule of Evidence 702 allows expert testimony only if it "substantially assist[s] the trier of fact." (emphasis added). Accordingly, "Tenn. R. Evid 702 requires a greater showing of probative force than the federal rules of evidence or the rules of evidence from those states that have followed the federal rules." Coley, 32 S.W.3d at 838. The defendant's second problem as to this issue is the nature of the opinion evidence which he seeks to admit. In Coley, our supreme court relied upon Ballard, 855 S.W.2d at 562, which explained that "expert testimony describing the behavior of an allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place," and State v. Schimpf, 782 S.W.2d 186, 193-94 (Tenn. Crim. App. 1989), which explained that expert testimony, concerning child sexual abuse syndrome, that a child had been sexually abused "invaded the jury's province by offering testimony which ultimately went to credibility." Applying the reasoning of Coley to this matter, we do not believe that expert testimony on eyewitness identification is made admissible by providing the expert witness copies of witness statements, as well as police and other reports. Even under these circumstances, the expert witness still would be invading the province of the jury in assessing the credibility of the eyewitness identifications. Accordingly, we conclude that the record supports the exclusion of the testimony of Dr. Loftus.

Additionally, the defendant argues on appeal that the trial court violated his right to due process of law in excluding his expert witness. Our supreme court rejected an identical claim in Coley because the testimony of the expert was not "critical" to the defense, the court explaining how such a claim should be assessed:

When considering whether the constitutional right to present a defense has been violated by the exclusion of evidence, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. See Chambers v. Mississippi, 410 U.S. 284, 298-301, 93 S. Ct. 1038, 1047-49, 35 L. Ed. 2d 297, 310-12 (1973). For the reasons stated above, the evidence excluded in this case is not critical to Coley's defense.

32 S.W.3d at 838 n.14.

Utilizing this reasoning, we conclude, likewise, in the present appeal that exclusion of the expert testimony did not violate the defendant's right to due process.

## II. Trial Court Errors

The defendant alleges the trial court erred: (A) by allowing the State to exercise a peremptory challenge based on the juror's learning disability; (B) by utilizing the pattern jury instructions on the element of deliberation; and (C) by subjecting the defendant to a trial before a death-qualified jury when the State withdrew its notice of intent to seek the death penalty post-trial.

## A. Peremptory Challenge

On appeal, the defendant argues the trial court failed to articulate specific reasons for the findings as required by Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), when it accepted the State's asserted race-neutral reason for the exclusion of a prospective juror and that even if it did so articulate, exclusion of a jury member on the basis of a learning disability is constitutionally improper. The State responds that it provided a sufficient race-neutral basis for the challenge, which was accepted by the trial court, and that there is no authority in Tennessee to support the extension of Batson to "disability discrimination."

In our review, we first will detail the manner in which this matter arose at trial. During jury selection, the State exercised a peremptory challenge to exclude a prospective juror, Alvin James, an African-American, from the venire. The defendant alleged a Batson violation, asserting that Mr. James was excluded because of his race. The State responded, "The answers on the questionnaire . . . were not filled out very well. He's got a – his education level, he clearly wasn't able – he's got a learning disability." The court observed, "I had some questions in my mind about that. I think that that's a valid reason for the General to challenge him, other than – I don't think there's any racial basis here." Also, the court stated on the record, "I'm confident that this . . . was a decision made that's race neutral, and we have another African-American member of the panel. I know we have a problem with that in Knox County, but we do. So I'm going to . . . overrule your motion." At the hearing on the motion for a new trial, the trial court stated:

I think it is appropriate for the [S]tate to use a peremptory challenge for someone who they think is going to have a difficult time listening to and comprehending the evidence in a case. I don't think that they had any improper motive, either racial or otherwise, in excluding this individual, but it was a legitimate reason to exclude them. I think that had the defense excluded them, the same logic would apply.

Batson established the procedure by which a trial court is to evaluate claims of racial discrimination in the jury selection process. In that case, an African-American criminal defendant had challenged the State's exclusion of African-Americans from his jury, and the United States Supreme Court held that the State's use of peremptory challenges to exclude jurors of the defendant's race violated the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. Batson, 476 U.S. at 89, 106 S. Ct. at 1719. Subsequently, in Powers v. Ohio, 499 U.S. 400, 415, 111 S. Ct. 1364, 1373 (1991), the Court held that a Caucasian criminal defendant had third party standing to raise the equal protection rights of African-American venire members who were excluded by the prosecutor's peremptory challenges. Thus, a defendant need not be of the same race as the excluded venire member to raise a Batson challenge to the prosecution's use of peremptory challenges.

To raise a Batson claim, the defendant must first make a prima facie showing of purposeful discrimination against a venire member. 476 U.S. at 93-94, 106 S. Ct. at 1721. This may be done by showing that the totality of relevant facts, considered together, raises an inference of purposeful discrimination. Id.; see Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 903 (Tenn. 1996). Once the defendant has established a prima facie case of discrimination, the burden of production then shifts to the State to offer a race-neutral explanation for the exercise of its peremptory challenge. Batson, 476 U.S. at 97, 106 S. Ct. at 1723; Purkett v. Elem, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770 (1995). This explanation "must be based on something more than stereotypical assumptions, but it need not rise to the level required to justify the exercise of a challenge for cause." State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992) (citing Batson, 476 U.S. at 97, 106 S. Ct. at 1723). The race-neutral explanation need not be "persuasive, or even plausible." Purkett, 514 U.S. at 768, 115 S. Ct. at 1771. If there is no discriminatory intent inherent in the explanation, it will be deemed to be race-neutral. Id. (citations omitted). Finally, the trial court must consider the totality of the circumstances to determine if the race-neutral explanation offered by the State is actually a pretext for purposeful discrimination. Batson, 476 U.S. at 97-98, 106 S. Ct. at 1723-24. "Because the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" Ellison, 841 S.W.2d at 827 (quoting Batson, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21). The best evidence of discriminatory intent "'often will be the demeanor of the attorney who exercises the challenge.'" Id. (quoting Hernandez v. New York, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869 (1991)). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768, 115 S. Ct. at 1771.

In its determination of whether a peremptory challenge has been exercised on discriminatory grounds, the trial court "must carefully articulate specific reasons for each finding on the record[.]"

Woodson, 916 S.W.2d at 906. "The trial court's findings are imperative for rarely will a trial record alone provide a legitimate basis from which to substitute an appellate court's opinion for that of the trial court." State v. Carroll, 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000). The trial court's findings are, therefore, entitled to great weight, and will not be set aside on appeal unless found to be clearly erroneous. Woodson, 916 S.W.2d at 906; Carroll, 34 S.W.3d at 319.

The record on appeal includes a copy of the seventeen-page juror questionnaire completed by Alvin James. A number of his answers are nonresponsive, while others are puzzling. Although he had listed a place of employment in response to an earlier question, his response was "no" to question 7, which asked, "Please list your current occupation or employment and length of time in that position." To question 17, asking for a variety of information about his educational background, including "how far" he went in school, he responded, "Vine, Jr. [and] Austin East." In response to question 33, "Do you have any difficulty in reading or writing?" he responded, "No." However, in response to question 38, as to whether he had a family member or friend who had been diagnosed as being "mentally retarded or as having a learning disability," he responded, "I have a reading disability." As to question 43a, "What is your understanding of the practice of hypnosis?" he responded, "No." In response to question 43b, "Do you believe that some individuals can be hypnotized?" he placed a check mark beside the word "no." As to a series of questions about his views on capital punishment, he placed checks by choices that he was not "in favor of the death penalty as a punishment for crime" and that he did not believe it served any "legitimate purpose." However, responding to a series of choices as to which statement "best represent[ed]" his belief, he marked, "I believe that the death penalty is appropriate for all crimes involving murder." Likewise, responding to the question whether the "death penalty should be used more frequently, less frequently or about the same as it has been as a punishment for first degree murder," he chose "more." His response was "no" to the question, "What was the last book you read?" To the question, "What is your personal opinion about the criminal justice system and the way it works?" he responded, "No." Likewise, he selected the "no" response to the question, "Do you believe that trial by jury is the best system for the trial of criminal cases?" He selected the "no" response to the question, "Do you want to serve as a juror in this case?"

While the trial court did not specifically find that the defendant had satisfied his burden of making out a prima facie case of discrimination in the jury selection process, such a finding was implicit in the trial court's request that the prosecutor state her race-neutral basis for the challenge. See Carroll, 34 S.W.3d at 320 (concluding that trial court's implicit finding that prima facie prong of Batson test had been met was sufficient for appellate review); see also Ellison, 841 S.W.2d at 827 ("Finding that the exclusion of one minority venire person can constitute a prima facie case is consistent with the principle set out in Batson.").

The defendant relies on our holding in State v. Spratt, 31 S.W.3d 587 (Tenn. Crim. App. 2000), for his assertion that he is entitled to a new trial because of the alleged erroneous application of the Batson procedure in this case. However, we do not agree that the trial court erroneously

applied <u>Batson</u>. Further, the defendant's reliance on <u>Spratt</u> is misplaced.[8] The record is sufficiently specific for us to determine that the trial court, after considering all the circumstances, correctly held that the State exercised its peremptory challenge for a race-neutral reason. In fact, we have carefully examined the questionnaire completed by this prospective juror; and it is clear that his responses are puzzling and inconsistent. It appears that he preferred to give a negative response regardless of whether it resulted in contradictory answers.

While acknowledging that "those with disabilities are not entitled to strict scrutiny under the federal constitution," the defendant relies upon <u>State v. Ferguson</u>, 2 S.W.3d 912 (Tenn. 1999), for the proposition that "[t]he rights provided in the Tennessee Constitution are at least equal, and . . . are in some cases superior, to those rights guaranteed in the U.S. Constitution." Thus, the defendant argues that even though federal equal protection challenges to discrimination based on learning disabilities are analyzed using the "rational basis" analysis, see <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 105 S. Ct. 3249 (1985), we should apply a "strict scrutiny" analysis to such discrimination claims under the Tennessee Constitution. We disagree with these arguments. First, the defendant's reliance on <u>Ferguson</u> is misplaced, for that case involved analysis under the due process clauses of the United States and Tennessee Constitutions, not the "equal protection" clauses. Second, it is well settled law in Tennessee that the equal protection provisions of the Tennessee Constitution "confer 'essentially the same protection' as the equal protection clause of the United States Constitution." <u>State v. Tester</u>, 879 S.W.2d 823, 827 (Tenn. 1994) (quoting <u>Tennessee Small School Systems v. McWherter</u>, 851 S.W.2d 139, 152 (Tenn. 1993)). Accordingly, in analyzing equal protection challenges under the Tennessee Constitution, Tennessee courts utilize the same framework of analysis developed by the United States Supreme Court. <u>Id.</u> at 828. Those with learning disabilities are not a "suspect class" under either the United States or Tennessee Constitution, and the "strict scrutiny" standard does not apply. Only a "rational basis" for the juror exclusion need be shown, which was done in this case. Accordingly, we find the defendant's argument to be without merit.

## B. Pattern Jury Instructions

The defendant also asserts the trial court erred by giving "pattern jury instructions" on the first degree murder element of deliberation, rather than the defendant's proposed jury instruction, which he asserts was a "clearer" and "more complete" definition of deliberation.

Defendants have a "constitutional right to a correct and complete charge of the law." <u>State v. Teel</u>, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a

---

[8]The facts of <u>Spratt</u> are distinguishable from the present case. In <u>Spratt</u>, the State made a "reverse <u>Batson</u> objection," asserting that the defendant was attempting to exclude jurors based on their race. 31 S.W.3d at 596. The trial court agreed and seated the jurors over the defendant's objection. On appeal, we held there was sufficient evidence that the defendant was asserting a proper race-neutral basis for exclusion, namely the potential jurors' "association with sex offense victims." <u>Id.</u> at 597. "When a defendant is wrongly deprived of peremptory challenges because of a trial court's erroneous application of the <u>Batson</u> test, the remedy is a reversal of the conviction and a remand for a new trial." <u>Id.</u> at 598. Here, the defendant was not wrongly deprived of a peremptory challenge.

complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). As long as the instructions given are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

Our holding in State v. Clifford Coleman, Sr., No. M2000-01916-CCA-R3-CD, 2002 WL 125694 (Tenn. Crim. App. Jan. 31, 2002), perm. to appeal denied (Tenn. June 3, 2002), is dispositive of this issue. There, we held the pattern jury instruction concerning the elements of first degree murder was sufficient:

> In our view, Tennessee Pattern Jury Instruction Crim. 7.01 correctly stated the law as it existed in 1995. Moreover, this court has specifically approved of its content, ruling that the pattern instruction contained an adequate explanation of the elements the state must prove beyond a reasonable doubt before a defendant may be convicted of first degree murder. State v. Makoka, 885 S.W.2d 366, 372 (Tenn. Crim. App. 1994). Thus, the trial court did not err in denying the special request on deliberation.

Id. at *6. In Makoka, we rejected the contention that the holding in State v. Brown, 836 S.W.2d 530 (Tenn. 1992), required instructions in addition to those contained in the pattern jury instruction, holding:

> Contrary to the appellant's contention, the instructions [T.P.I.–Crim. 7.01] given by the trial court were full and complete. Furthermore, the instructions contained an adequate explanation of each element that must be present before an accused can be convicted of murder in the first degree.
>
> The Supreme Court's decision in Brown does not require a more definitive explanation of "deliberation" than given by the trial court.

885 S.W.2d at 372. We have reviewed the jury instructions in this case and have determined they were a "full and complete" instruction on the law of deliberation, an element of first degree murder at the time of the crime committed by the defendant.

### C. Death-Qualified Jury

The defendant was convicted of first degree premeditated murder and acquitted of felony murder by a death-qualified jury. The State withdrew its notice of intent to seek the death penalty after Mrs. Cook testified, as the punishment phase was about to begin, that she and her family wanted the defendant to serve life in prison. She said she had made this decision only the night before. The trial court then imposed such a sentence. The defendant now argues his due process rights were violated because "[i]t has been scientifically shown that death-qualified juries are more likely to convict." This argument has been rejected by our supreme court. See Teel, 793 S.W.2d

at 246; Harbison, 704 S.W.2d at 318. As to this issue, there is no claim of bad faith by the State, and we conclude the defendant's claims are without merit.

### III. Sufficiency of the Evidence

The defendant contends the evidence was insufficient to support a verdict of guilt with respect to deliberation, an element of first degree premeditated murder at the time of the crime in 1991.[9]

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Additionally, on appellate review, "[w]e are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and

---

[9]We note that in the defendant's motion for new trial and amended motion for new trial, the asserted ground of relief was insufficient evidence to support a finding of premeditation. In the memorandum submitted with the amended motion, the defendant changed "premeditation" to "deliberation." He asserted in a footnote that "[t]his memorandum by the defendant supercedes and amends prior filings on this particular ground for relief." Since the State did not object to this procedure but responded on the merits, we will consider it.

legitimate inferences that may be drawn from the evidence." State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003), cert. denied, __ U.S. __, 124 S. Ct. 2174, 158 L. Ed. 2d 743 (2004).

In 1991, first degree murder was defined in Tennessee Code Annotated section 39-13-202(a)(1) as "[a]n intentional, premeditated and deliberate killing of another." "Deliberate act" was defined in Tennessee Code Annotated section 39-13-201(b)(1) as an act "performed with a cool purpose." Our supreme court elaborated on deliberation in Brown, stating that deliberation "requires some period of reflection, during which the mind is 'free from the influence of excitement or passion.'" 836 S.W.2d at 540 (quoting Clarke v. State, 218 Tenn. 259, 402 S.W.2d 863, 868 (1966)). In State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), our supreme court further elaborated on the element of deliberation:

> The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing. Brown, 836 S.W.2d at 539. There are several factors which tend to support the existence of these elements which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

The list is not exclusive nor must all of the listed circumstances be present for a jury to find deliberation. Sandy Buckner testified that on the morning of March 23, 1991, she drove the defendant home around 5:00 a.m. There was no indication he had a gun with him at that time. Apparently, the defendant went to his house and retrieved a .22 caliber weapon and, by 6:00 a.m., was sitting near the interstate "shooting at cars," as he later related to Loretta Strange. The defendant shot the unarmed victim twice in the head and then forced the victim's wife to hold the victim as he lay bleeding to death in their van, while the defendant drove around for fifteen to twenty minutes, looking for a place to dump his victims. While driving the van, the defendant told Mrs. Cook he planned to kill her in order to conceal his criminal acts. Shortly after the crimes, the defendant made plans to deal with his bloody clothes, hide his weapon, and change his appearance to avoid arrest. Based upon our review of the record, we conclude there was sufficient evidence for a reasonable jury to find the defendant acted with deliberation in the murder of Mr. Cook.

## IV. Constitutionality of the Death Penalty

Because the State withdrew its notice of intent to seek the death penalty in this case, and therefore the defendant was sentenced to life imprisonment, he lacks standing to challenge the death penalty on appeal. Nonetheless, Tennessee courts have repeatedly held that Tennessee's death penalty provisions are constitutional. See, e.g., State v. Reid, 91 S.W.3d 247, 313 (appendix) (Tenn. 2002); State v. Morris, 24 S.W.3d 788 (Tenn. 2000). More specifically, the defendant alleges that the United States Supreme Court decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002), require that aggravating

factors in a capital case be charged in the grand jury indictment. Our supreme court addressed and rejected this contention in State v. Dellinger, 79 S.W.3d 458 (Tenn. 2002), and has repeatedly reaffirmed its holding in Dellinger in light of Ring, Apprendi, and Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), by rejecting such a requirement. State v. Holton, 126 S.W.3d 845 (Tenn.), cert. denied, __ U.S. __, 125 S. Ct. 62 (2004); State v. Odom, 137 S.W.3d 572 (Tenn. 2004); see also State v. Berry, 141 S.W.3d 549 (Tenn. 2004); State v. Leach, 148 S.W.3d 42 (Tenn. 2004). Accordingly, the defendant's contention is without merit.

## V. Cumulative Error

The defendant argues that the cumulative effect of the trial court's errors warrants a new trial. Having found no errors committed by the trial court, we respectfully disagree.

## VI. Sentencing

As we have stated, the trial court ordered that the defendant's life sentence for first degree premeditated murder be served concurrently with his twenty-two-year sentences for especially aggravated kidnapping and especially aggravated robbery and that they all be served consecutively to his twenty-five-year sentence for attempted first degree murder. On appeal, he first argued that the trial court had erred in finding that the mitigating factor of childhood/family background applied to each of the convictions but then sentencing him to the maximum term of twenty-five years for the attempted first degree murder conviction. Subsequently, the defendant filed a "Notice of Supplemental Authority and Motion for Correction of Sentence in Light of Blakely v. Washington" on July 28, 2004, prior to the oral arguments being made in this matter. He asserts that his sentences for the especially aggravated robbery, especially aggravated kidnapping, and attempted first degree murder convictions should each be reduced to the statutory minimum of fifteen years because the constitutionality of Tennessee's enhancement scheme has been called into question by Blakely. He also contends his sentence for his attempted first degree murder conviction should have been ordered to be served concurrently with the other sentences.

Four witnesses testified on behalf of the defendant at the sentencing hearing. Cleo Wilcox, the defendant's half-sister, said that the defendant's father was "an alcoholic. He was abusive. He was always bragging about shooting people." The defendant's father introduced him to vodka, when he was between three and five years old. The defendant's paternal grandmother occasionally babysat the defendant and called him "a little bastard" and said that "they had to hide him when the company come 'cause he was so ugly." Wilcox testified that after she had moved out of the house, she returned to discover that the defendant, then ten years old, had "Bright's kidney disease" and "was swollen so bad that you didn't even know it was him." She agreed that the defendant was a dangerous person, as a result of the way he was raised.

Martha Haun, a former neighbor of the defendant, testified that the defendant's childhood household was "more or less . . . a bunch of drunks out in the yard and a child watching hisself [sic]." The defendant started coming to her house at the age of three or four, ate many meals at her

house, and "was like a little stray dog, you know, you let out and go in the yard. He just went where he wanted to." She said the defendant's father cursed him "all the time." At one point, she inquired into the defendant staying with her, but the defendant's father refused to let him.

Paula Hawley, a state probation and parole officer, testified that the defendant was placed in her "MRT" class, a "twelve-step program," as part of his probation from 1997 to 2000. He was the "guru of the class" and everyone "looked up to him." At one point, the defendant told the class that he had caught his wife with another woman but said he forgave her. She said he never completed the program because "[h]e didn't want to leave the class. He . . . liked being there."

Meredith Driskell, a court bailiff, testified that she was formerly a probation officer and the defendant was on her caseload. He met all of the requirements of his probation successfully and had a "very good work ethic." After his probation ended, the defendant called Driskell asking for assistance with a recurring drinking problem. On cross-examination, Driskell testified that at one point, the defendant told her, "If you knew me, you would not be sitting here with me."

According to the presentence report, the defendant had the following prior adult convictions: March 10, 2000, DUI, eleven months, twenty-nine days, suspended to forty-eight hours, fine and costs; December 17, 1996, driving while license suspended/cancelled/revoked, eleven months, twenty-nine days, suspended; March 14, 1995, public intoxication, thirty days, suspended all but time served; January 27, 1995, disorderly conduct, time served; May 27, 1994, possession of marijuana less than one-half ounce, eleven months, twenty-nine days, suspended to forty-eight hours and driving with a revoked license, six months, suspended to forty-eight hours; September 21, 1993, driving while license suspended, six months, suspended to eleven months, twenty-nine days probation; August 26, 1993, assault, eleven months, twenty-nine days; May 18, 1993, driving while license suspended, six months, suspended to eleven months, twenty-nine days probation; January 26, 1995, theft of property, $1,000 to $10,000, four years, serve one year in Knox County Penal Farm and three years on intensive probation; January 26, 1995, leaving the scene of an accident, thirty days; October 26, 1992, carrying a weapon, thirty days suspended; February 25, 1992, two counts of assault, six months suspended to probation, probation revoked, serve thirty days; December 20, 1991, criminal trespass, eleven months, twenty-nine days suspended to probation, probation revoked, serve at 50%; March 5, 1991, driving with a revoked license, two days; May 4, 1991, driving with a revoked license, six months suspended all but forty-eight hours; May 5, 1991, driving with a revoked license, two days.

In sentencing the defendant, the trial court applied enhancement factor (2), prior criminal history, to all three offenses; factor (4), the offense involved more than one victim, to the especially aggravated kidnapping and attempted first degree murder; factor (6), exceptional cruelty, to all three offenses; factor (9), offenses committed during probationary periods, although little weight was ascribed to this factor; factor (10), use of a firearm, to the attempted first degree murder; and factor (21), burglary conviction as a juvenile which would be a felony if the defendant had been an adult. See Tenn. Code Ann. § 40-35-114(2), (4), (6), (9), (10), (21) (2003). As for mitigating factors, the trial court applied factor (13) to each of the convictions. Id. § 40-35-113(13).

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

The defendant has argued on appeal that, applying the holding of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), which was decided after he had been sentenced, he should be sentenced to the minimum punishment for especially aggravated robbery, especially aggravated kidnapping, and attempted first degree murder. However, Blakely did not alter the power of the trial court to utilize the defendant's prior convictions in increasing his sentence from the minimum. Id. at __, 124 S. Ct. at 2536 (citing Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348 (2000)) (prior conviction may be utilized by trial court for sentence enhancement without submission to a jury). Applying this enhancement factor to the three sentences in question, as well as the mitigating factor of the defendant's childhood/family background, we conclude that his sentences should be reduced. We disagree with his claim that because certain of the enhancements factors applied by the trial court are violative of Blakely, he may be sentenced only to the minimum for each offense. Accordingly, we modify the defendant's sentences as follows: attempted first degree murder, twenty-one years; especially aggravated robbery, eighteen years; and especially aggravated kidnapping, eighteen years. His sentence for first degree murder is not affected by Blakely.

In determining that the sentences for first degree murder and attempted first degree murder should be served consecutively, the trial court concluded that criterion (4) was applicable: "The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The facts of these crimes support that determination.

We disagree with the defendant's arguments that Blakely does not allow the trial court to order consecutive sentencing. The courts have interpreted the holding in Apprendi to allow a trial court to continue to determine whether sentences should be served consecutively. United States v. Samuel, 296 F.3d 1169, 1175 (D.C. Cir. 2002) ("[T]he district court did not commit Apprendi error when it enhanced [the defendant's] sentence because he committed the second of his narcotics offenses while he was on release for the first."); People v. Williamson, 747 N.E.2d 26, 34 (Ill. Ct. App. 2001) (trial court may consider "the nature and circumstances of the offense and the history and character of the defendant" in determining whether consecutive sentencing "is required to protect

the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record"). Subsequently, our supreme court noted in Robinson, 146 S.W.3d at 499 n.14, that "several courts" had rejected the claim that Blakely and Apprendi apply to a determination as to whether sentences should be served consecutively. We conclude that neither Blakely nor Apprendi affects the trial court's ordering that the sentences in this matter be served consecutively.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the convictions but modify the defendant's sentences for attempted first degree murder, especially aggravated robbery, and especially aggravated kidnapping to twenty-one years, eighteen years, and eighteen years, respectively.

_____
ALAN E. GLENN, JUDGE